# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CASPER SLEEP, INC.

               Plaintiff,

     v.

DEREK HALES and
HALESPOLIS LLC,

             Defendants.

Case No. 16-cv-02736

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P 12(B)(6)

Jeffrey S. Jacobson (JJ-8872)
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
(212) 808-5145
jjacobson@kelleydrye.com

Counsel for Defendants
Derek Hales and Halesopolis LLC

SUMMARY OF ARGUMENT ...................................................................................1

STATEMENT OF FACTS ......................................................................................2

ARGUMENT ..........................................................................................................7

I.     CASPER'S FALSE ADVERTISING CLAIM SHOULD BE DISMISSED FOR
FAILURE TO STATE A CLAIM .......................................................................8

     A.     Hales' "Sleepopolis" Website is Not an Actionable "Product." .............9

     B.     Casper does not allege any actionably false or misleading statements
by Hales ............................................................................................10

     C.     The Federal Trade Commission's Guidance for Disclosure of Affiliate
Relationships Gives Rise to No Private Right of Action and Cannot
Form the Basis of a Section 43(a) Claim ..............................................14

     D.     Casper's complaint does not and cannot sufficiently allege the materiality
of Hales' alleged omissions to consumers' purchasing decisions .........16

     E.     Casper Lacks Standing To Assert Its Lanham Act Claim Because It Cannot
Tie Its Alleged Injury To Hales' Purportedly Inadequate Disclosures.................19

II.     CASPER'S NEW YORK GEN. BUS. LAW. § 349 CLAIM FAILS BECAUSE
CAPSER HAS NOT PLEADED AN INJURY TO THE PUBLIC ...................22

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill Ltd v. Interstate Cigar Co.*,
  499 F.2d 232 (2d Cir. 1974)...................................................................14

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .........................................................................8

*Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*,
  984 F. Supp. 768 (S.D.N.Y. 1997) ........................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................8

*Cablevision Sys. Corp. v. Verizon N.Y., Inc.*,
  119 F. Supp. 3d 39, 53 (E.D.N.Y. 2015) ...............................................12

*Casper Sleep, Inc. v. Mitcham*,
  No. 16-cv-3224 (JSR) ............................................................................6

*Cheng Kai Yu v. Klapper*,
  No. CV 88-3683, 1989 WL 47702 (E.D.N.Y. Apr. 28, 1989) ................14

*Conopco Inc. v. Wells Enterprise, Inc.*,
  No. 14 Civ. 2223 (NRB), 2015 WL 2330115 (S.D.N.Y. May 14, 2015)..............23

*Conte v. Newsday, Inc.*,
  No. 06-CV-4859 (JFB) (ETB), 2013 WL 978711 (E.D.N.Y. Mar. 13, 2013) .......22

*Eprova v. BrookStone Pharms.*,
  920 F.Supp. 2d 404 (S.D.N.Y. 2013)......................................................16

*Gifford v. U.S. Green Bldg. Council*,
  No. 10 Civ. 7747 (LBS), 2011 WL 4343815 (S.D.N.Y. Aug. 16, 2011) ..............22

*Gottlieb Dev., LLC v. Paramount Pictures Corp.*,
  590 F.Supp.2d 625 (S.D.N.Y. 2008).......................................................18

*Groden v. Random House, Inc.*,
  61 F.3d 1045 (2d Cir. 1995)...................................................................12

*Hertz Corp. v. Avis, Inc.*,
  867 F. Supp. 208 (S.D.N.Y. 1994) .........................................................11

*IQ Prods Co. v. Pennzoil Prods. Co.*,
  305 F.3d 368 (5th Cir. 2002) ....................................................................................14, 15

*Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) ....................................................................................16

*Kforce, Inc. v. Aiden Personnel, Inc.*,
  288 F. Supp. 2d 513 (S.D.N.Y. 2003)...........................................................................24

*L & J.G. Stickley, Inc. v. Cosser*,
  255 Fed. Appx. (2d Cir. 2007)......................................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014)......................................................................................19, 20, 21

*Licata & Co., Inc. v. Goldberg*,
  812 F. Supp. 403 (S.D.N.Y 1993) ................................................................................11

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995)............................................................................................12

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
  501 F. Supp. 517 (S.D.N.Y. 1980) ...............................................................................10

*Merck & Co. v. Mediplan Health Consulting*,
  425 F.Supp.2d 402 (S.D.N.Y. 2006).............................................................................16

*Merck Eprova AG v. Gnosis S.p.A.*,
  901 F.Supp.2d 436 (S.D.N.Y. 2012)...............................................................................9

*Muhler Co. v. Ply Gem Holdings, Inc.*,
  637 Fed. Appx. 746 (4th Cir. 2016)..............................................................................21

*Mylan Pharm., Inc. v. Proctor & Gamble Co.*,
  443 F.Supp.2d 453 (S.D.N.Y. 2006).............................................................................16

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir. 1997)..........................................................................................16

*Nationwide CATV Auditing Serv., Inc. v. Cablevision Sys. Corp.*,
  No. 12-CV-3648 (SJF) (ETB), 2013 WL 1911434 (E.D.N.Y. May 7, 2013) ........................18

*Ndremizara v. Swiss Re. Am. Holdings Corp.*,
  93 F.Supp.3d 301 (S.D.N.Y. 2015) ................................................................................7

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
  760 F. Supp.2d 446 (S.D.N.Y. 2011).............................................................................9

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
No. 08-CV-442 (TPG) (FM), 2014 WL 4723299 (S.D.N.Y. Sept. 23, 2014)..................23, 24

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
No. 08cv0442 (DLC), 2016 WL 815205 (S.D.N.Y. Feb. 29, 2016) ................................13, 23

*Societe des Hotels Meridien v. LaSalle Hotel Opening P'ship, L.P.*,
380 F.3d 126 (2d Cir. 2004)...................................................................................................10

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007)...................................................................................................11

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1138879 (S.D.N.Y. Apr. 16,
2007) .................................................................................................................................13, 15

*VRM Products, LLC v. V2H ApS*,
No. 2:13-cv-7719-CBM-JEMx, 2016 WL 1177834 (C.D. Cal. Mar. 18, 2016) ...................22

*Wall & Assocs., Inc. v. Better Bus. Bureau of Central Virginia, Inc.*,
Civ. No. 1:16-cv-119, 2016 WL 3087055 (E.D. Va. May 31, 2016) ................................21, 22

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
516 F. Supp. 2d 270 (S.D.N.Y. 2007)........................................................................12, 15, 16

**Statutes**

16 C.F.R. § 255 (2016).....................................................................................................14

15 U.S.C. § 1125(a) ......................................................................................................9, 10

**Other Authority**

5 J.Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.55
(4th ed. 2016)...............................................................................................................11

Defendants Derek Hales and Halesopolis LLC (collectively, "Hales") respectfully submit this memorandum of law in support of their motion to dismiss, with prejudice, all claims asserted by plaintiff Casper Sleep, Inc. ("Casper"), pursuant to Fed. R. Civ. Proc. 12(b)(6).

## SUMMARY OF ARGUMENT

Plaintiff Casper Sleep, Inc. ("Casper") manufactures and sells mattresses, and defendant Derek Hales, blogging at his website www.sleepopolis.com, posts written and video reviews of mattresses. Hales has never made an untrue statement of fact about Casper mattresses or any other mattresses, and Casper does not allege that he did. But Hales has been mildly critical of Casper's mattresses, which Casper admits it had not changed between the product's 2014 launch and this lawsuit, in that Hales has opined that newer entrants to the mattress market are both better and less expensive than Casper's mattress. Casper apparently cannot abide this criticism, and has forced Hales into court some 2,000 miles from his Arizona home to defend bogus claims that his expressions of opinion violate the Lanham Act and New York consumer fraud law.

The Lanham Act allows "competitors" to sue over false or misleading statements. Casper, however, is not a "competitor" of an opinion author like Hales, and it does not allege any "false statements" by Hales. Casper's complaint is about an alleged omission: Hales has "referral links" on his website allowing readers to purchase the mattresses he reviews, and if readers use these links, or use Sleepopolis-specific coupon codes, to purchase and keep mattresses, Hales receives a referral fee for those sales. He has always disclosed his receipt of those fees in several places on his website, and Casper admits as much. Casper complains only about the prominence of these disclosures, and that complaint is not actionable under the Lanham Act.

Nor is Casper's claim actionable under New York Gen. Bus. Law. § 349. Courts uniformly have rejected attempts to transform advertising disputes into violations of that consumer fraud law,

holding that companies (as opposed to consumers) may bring § 349 claims only where an allegedly false statement puts the general public *at risk*. Here, there is nothing wrong with the competitive mattresses that Hales recommended over Casper's, and hence no claim under § 349.

Casper's claims have neither precedent nor basis, and this Court should dismiss them with prejudice. This naked attempt to bully Hales off the air should end, here and now.

## STATEMENT OF FACTS

Casper's complaint explains that "in early 2014, Casper launched as an innovative new sleep start-up." First Amended Complaint (Dkt. No. 17) (hereafter "Compl.") ¶ 2. Casper has "one mattress," which it "s[ells] directly to consumers online with a risk-free in-home trial." *Id.* ¶¶ 2, 14. Casper had great success with its model initially, *see id.* ¶ 16, and its "ascent . . . inspired competitors," with "dozens of online mattress retail start-ups" now "selling mattresses on their own websites and on third-party platforms such as Amazon[.com]." *Id.* ¶ 17. But while these newer entrants to the market have made innovations, or undercut Casper on price, "the Casper mattress itself has not materially changed during the relevant time period." *Id.* ¶ 40.

Several people, including Hales, entered the business of educating consumers about the differences between the various available mattresses — reviewing them, comparing them, and demonstrating them in online videos. *See* Compl. ¶ 4. Hales furnished these reviews at his Sleepopolis website. *Id.* ¶ 5. Hales praised Casper's mattress when it first launched, *see id.* ¶ 40, but then, after trying other mattresses that came on the market after Casper's, Hales wrote that "a lot has changed since [he] first tested Casper." *Id.* Casper competitors "Leesa, Brooklyn Bedding, Love Bed, GhostBed, and Helix all offer improved performance at a better value compared to the Casper," and Hales' website stated that he preferred them. *Id.* ¶ 38.

Each of Hales' reviews explained in detail the differences between the mattresses he compared.  He included a long narrative about each bed, a side-by-side comparison of certain important factors in choosing a mattress (firmness, edge support, etc.), and a price chart. Compl. Ex. B. at 6-11 (review of Leesa mattress); 12-17 (review of Purple mattress); 18-23 (review of Nest Bedding Alexander Hybrid mattress); 24-29 (review of Novosbed mattress); 30-35 (review of GhostBed mattress); 70-75 (review of Casper mattress). In each comparative review, when Hales expressed a preference for the competitor's mattress over Casper's, he did so on the basis of price, features, or a combination of the two. Compl. Ex. B at 36-43 (Purple v. Casper review); 44-49 (Helix v. Casper review); 50-56 (Brooklyn Bedding v. Casper review); 57-63 (Ghostbed v. Casper review); 64-69 (Leesa v. Casper review). Casper's complaint does not allege that any of the facts stated in Hales' reviews of Casper's mattress or competitors' mattresses were inaccurate in any way.

**Casper vs. Leesa**

Typical of Hales' reviews of mattresses less expensive than Casper's is his review of the mattress manufactured by Casper's competitor Leesa.  Hales' review stated that the Leesa mattress has three layers.  The top layer is two inches, rather than Casper's one-and-a-half.  (The mattress overall is 10 inches, a half-inch larger than Casper's.)  Compl. Ex. B. at 6.  As Hales noted, "[m]ost hybrid mattresses [including Casper's] only utilize 1 or 1.5 inches of latex (or similar Latex-like foam)/memory foam in construction.  Having 2 inches of Avena [foam] and two inches of memory foam makes a big difference in how the mattress sleeps."  *Id.* at 7.  Hales also spoke favorably about the cover of the Leesa mattress, which "looks awesome" and is "a high quality piece of material that has been woven well."  As for price, although the list price of the Leesa mattress is $40 higher than Casper's for a Queen or a King bed, Leesa offered a $75 "promo code" discount

3

to Sleepopolis readers, making its beds $35 less expensive than Casper's.  *Id.* at 9.  Further, Hales'
review stressed Leesa's "One:Ten" program, pursuant to which the company "donates 1 mattress
for every 10 they sell."  *Id.* at 10.

When Hales wrote a separate comparison review of the Leesa mattress to Casper's, he
called the choice "one of the closest to call reviews that I have ever done."  Compl. Ex. B. at 68.
Ultimately, however, he recommended the Leesa.  *See id.*  He made the recommendation based on
Leesa's inclusion of one more inch of "specialty foam" in the middle layer than Casper's mattress,
offering "better durability and better deep compression support."  *Id.*  He also stated that he found
the cover of the Leesa mattress "to just be better made," and that the Leesa had slightly better
"edge support" for sleepers who lie close to the edge of the mattress.  *Id.* at 68-69.  Hales did not
differentiate the two mattresses based on price, even though the coupon Leesa offered through his
site made Leesa's mattresses slightly less expensive than Casper's.  The review included links
through which readers could purchase either mattress, the Leesa from the manufacturer and the
Casper from Amazon.com.  *Id.* at 69.  Indeed, all of Hales' comparative reviews cited in the
complaint includes links through which readers could purchase the Casper.  Compl. Ex. B at 42;
49; 55 and 63.

**Casper vs. Helix**

Another mattress that Casper's complaint notes Hales preferred over Casper's is sold by
Casper's competitor Helix.  Hales noted that the Casper mattress has "an ample amount of
softness" and "does not exhibit the trapped feeling that can sometimes accompany traditional
memory foam mattresses."  Compl. Ex. B. at 47.  He would not opine on the Helix mattress's
"feel," because a Helix purchaser must "complete their specialized mattress quiz" to "help[] them
determine the exact firmness, cooling, support, sleeping positions, and any medical conditions"

4

the consumer may have. *Id.* at 45. The Helix mattress "can literally be built with two custom sides and seamlessly sewn together to form one mattress." *Id.* The prices for the Casper and the Helix, net of a $50 coupon code offered on Sleepopolis, nevertheless were identical for a Queen bed and $5 less expensive for a Helix King bed. *See id.* at 45, 47. In other words, for the same price as Casper's non-customized mattress, one could purchase a customized Helix bed. Hales' side-by-side comparison of the two mattresses showed no advantage for either in most categories, other than that the firmness of the Helix mattress was customizable. *See id.* at 48. Because of the customization, Hales opined that "the Helix was an overall better mattress in my opinion." *Id.*

**Casper vs. Brooklyn Bedding**

Hales' comparison of Casper's mattress to that of Brooklyn Bedding was similar to his comparisons of other mattresses that had a two-inch top layer. Unlike Casper, which offers only one type of mattress, Brooklyn Bedding offers three levels of firmness. *See* Compl. Ex. B. at 51. Hales favorably reviewed the "bounce" of the Brooklyn Bedding mattress, noting the superiority of its "100% latex comfort layers" that "are able to create a bounce that most foam mattresses cannot compete with." *Id.* The Brooklyn Bedding mattresses also were less expensive than Casper's, with the price difference widening further if consumers used a 5% off promo code available through Sleepopolis. *See id.* at 52. That "price point" differential was a main reason, in addition to "design, performance, [and] materials," why Hales, in comparing the two, opined that "Brooklyn Bedding is simply the better mattress." *Id.* at 55.

**Casper vs. GhostBed**

The mattress made by GhostBed, like Casper's, had a 1.5 inch top layer of latex foam, but the GhostBed mattress was 1.5 inches thicker overall, owing to deeper second and third layers. Compl. Ex. B at 57. As Hales wrote, "[h]alf an inch may not sound like much, but it without

question makes a notable difference in the comfort and feel." *Id.* at 63.  Hales noted that the

GhostBed "softened" a bit after he initially thought the mattress was firmer than the Casper, but

that this softening did not affect the "support" of the GhostBed mattress.  *Id.* at 58.  GhostBed

offered a 20-year warranty, twice as long as the 10-year warranty offered by Casper, and faster

shipping.  *See id.* at 62.  Most importantly, the GhostBed mattresses' list prices were $100 lower

than Casper's for a Queen bed and $75 lower for a King bed, even without taking into account an

additional $50 savings coupon that GhostBed made available through Sleepopolis.  *See id.*  That

combination of factors caused Hales to recommend the GhostBed mattress over the Casper.

### Hales' Receipt of Referral Link Fees

Each of the coupon codes provided in Hales' reviews referenced in the Complaint had the

name "Sleepopolis" as part of the code.  *E.g.,* Compl. Ex. B at 64 (the coupon code for a Leesa

mattress was "Sleepopolis75").   His review pages contained website links that consumers could

use to purchase the mattresses Hales reviewed.  Casper alleges, and is correct, that "Hales receives

a commission whenever a consumer uses one of the Sleepopolis coupon codes or [referral] links

. . . to purchase a mattress."  *Id.* ¶ 31.  Casper contends (again correctly) that it has no referral link

arrangement with Hales, *id.* ¶ 30, but Casper's exhibits demonstrate that Hales' reviews of

Casper's mattress contain links allowing consumers to purchase Casper's mattress from

Amazon.com.  *See, e.g.,* Compl. Ex. B. at 63 (link to "[v]isit Casper on Amazon").  Casper has

judicially admitted in another pleading in this District that "on [Casper's] information and belief,

when users purchase a Casper mattress . . . on Amazon after clicking on [an] Amazon link, [the

referrer] receives a small payment if Amazon processes the transaction."  *Casper Sleep, Inc. v.*

*Mitcham*, No. 16-cv-3224 (JSR), First Amended Complaint (Dkt. No. 17, filed June 9, 2016) at ¶ 30.[1]

### Hales' "Commitment to Integrity and Honesty"

Casper's complaint quotes from a page on Hales' website where Hales stated, among other things, that "[a]ll content you find on Sleepopolis is my genuine, honest, and full editorial opinion" and that "[n]o review or content is written, directed, or otherwise influenced by any manufacturer or sleep company." Compl. ¶ 29, *quoting id.* Ex. B at 1. Notably, Casper's complaint does not challenge the truth of either statement. Casper complains that consumers reading those lines may not realize that Hales receives referral fees. But on the very same "Commitment to Honesty and Integrity" disclosure page Casper relies upon, Hales prominently revealed his receipt of those fees:

> Many links on Sleepopolis are "affiliate links" (see below). If you click one of these links, and purchase a mattress, Sleepopolis will receive a small monetary commission. These links do not cost you a penny more. These referral commissions help to pay for the expenses associated with Sleepopolis (mattress storage space, video equipment, photography equipment, web hosting, servers, advertising, etc.).

Compl. Ex. B. at 1. Then, right below that statement, Hales included a more detailed description of what "affiliate links" are. *Id.*

### ARGUMENT

Casper has not alleged and cannot allege facts sufficient to show that Hales violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), New York Gen. Bus. Law § 349, or any other law. Casper's complaint fails to allege the elements of a Lanham Act claim, and even if it had, Casper

---

[1] Defendants request that the Court take judicial notice of the above-referenced pleading. *See Ndremizara v. Swiss Re. Am. Holdings Corp.,* 93 F.Supp.3d 301, 313 n.7 (S.D.N.Y. 2015) ("The Court may take judicial notice of pleadings filed in other cases in deciding a motion to dismiss without converting that motion into a motion for summary judgment.")

cannot show that alleged "misstatements" by Hales proximately caused its alleged losses, as the Supreme Court has required for Section 43(a) claims.  Casper also has not alleged that Hales' *truthful* reviews of Casper's mattress and competitive mattresses have caused harm to New York consumers, as required for a G.B.L. § 349 claim.  For all these reasons, this Court should dismiss Casper's complaint against Hales, with prejudice.[2]

## I.   CASPER'S FALSE ADVERTISING CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Hales' research has uncovered no prior case in which the seller of a product has tried to use the Lanham Act to squelch *truthful* criticism of its product even from a competitor, much less a non-competitor.  Unable to contend that Hales made any false statements about Casper's own mattress or any other mattress, Casper contends only that when Hales accurately described the mattresses made by Casper's competitors as being less expensive and/or more fully-featured than Casper's mattress, Hales did not disclose prominently enough his receipt of referral fees if consumers purchase mattresses using the "Sleepopolis"-specific coupon codes and website referral links on his site.  This fails to state a claim under the Lanham Act for at least **five** reasons:  (A) Hales' website is not an actionable "product" about which Casper can sue; (B) Casper's own exhibits show that he made no false or misleading statements; (C) Casper's claims that Hales did not disclose his fees prominently enough rests solely on Federal Trade Commission guidance that confers no private right of action; (D) Casper cannot allege that the statements it challenges as

---

[2]    To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient facts, accepted as true, to "state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do," and neither do "naked assertions devoid of further factual enhancement."  *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.*

false were material to consumers' purchasing decisions; and (E) Casper cannot allege that the statements it challenges are the proximate cause of its alleged injury.[3]

### A.    Hales' "Sleepopolis" Website is Not an Actionable "Product."

The ordinary Section 43(a) claim is brought by one competitor against another, where the defendant has misrepresented its own product or the plaintiff's.  *See, e.g., Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp.2d 446 (S.D.N.Y. 2011) (alleging that competitor defendant's statements about plaintiff's products were false).  Here, however, the Sleepopolis site is not a "competitor" of Casper's.  Hales merely *reviews* mattresses; he does not manufacture or sell them.  This would be the first case, therefore, to hold that opinions stated on a website are "products" over which one may maintain a Lanham Act suit.  The Court should not reach that result.

Notably, Casper has not sued any of its competitors for allegedly false or misleading marketing practices.  Casper's complaint states that "Casper's competitors make the most of Hales' . . . reviews, promoting them through their own social media accounts."  Compl. ¶ 45; *see also id.* ¶ 42 (noting "Leesa's practice of 'sponsoring' reviewers' YouTube videos," and including Leesa-specific advertisements in the link to the videos).  Casper apparently does not believe its competitors' "promotion" of Hales' reviews to be actionable, however, presumably because nothing in Hales' reviews of Casper's mattress or the competitors' mattresses is false or misleading, and because those competitors have the financial wherewithal to fight Casper "to the

---

[3]    For Casper's claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), to survive, Casper must plausibly plead that (1) Hales made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material, in that it is likely to influence purchasing decisions; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.  *See, e.g., Merck Eprova AG v. Gnosis S.p.A.*, 901 F.Supp.2d 436, 449-50 (S.D.N.Y. 2012).

mattresses."  Casper has only sued Hales and other bloggers — defendants who do not have the resources to fight back.  The Lanham Act has never been used successfully in this way before, and if the Act indeed could be stretched in this way, it would raise serious First Amendment concerns.

### B. Casper does not allege any actionably false or misleading statements by Hales.

Fortunately, however, the Court need not wrestle with Constitutional issues, because Casper's complaint falls well short of the Lanham Act's statutory prerequisites.  Even were Hales' website a "product" that Casper could challenge through the Lanham Act, the *only* statements anywhere on Hales' website that Casper tries to portray as "false" are those on his "Honesty and Integrity" page, where Hales states that "[a]ll content you find on Sleepopolis is my genuine, honest, and full editorial opinion" and that "[n]o review or content is written, directed, or otherwise influenced by any manufacturer or sleep company."  Compl. ¶ 29, *quoting id.* Ex. B at 1.  Casper does not try to contend that Hales' reviews are anything other than his "genuine opinion," and a statement like that would not be actionable under the Lanham Act even in any event.

*Omissions* are not actionable under the Lanham Act, either.  *See, e.g., Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 798 (S.D.N.Y. 1997) ("[T]he Lanham Act impos[es] no affirmative duty of disclosure."); *McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 532 (S.D.N.Y. 1980) ("A failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under . . . the Lanham Act.").  Only false or misleading *affirmative* statements may be actionable, and to sue for such a statement, a Section 43(a) plaintiff must demonstrate that: "(1) the advertisement is literally false . . . or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers."  *L & J.G. Stickley, Inc. v. Cosser*, 255 Fed. Appx., 541, 543 (2d Cir. 2007), *quoting Societe des Hotels Meridien v. LaSalle Hotel Opening P'ship, L.P.*, 380 F.3d 126, 132 (2d Cir. 2004).

A literally false statement must be unambiguous, egregious and objectively false on its face.  *See* 5 J.Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.55 (4th ed. 2016).  If a statement is subject to more than one possible interpretation, it is not literally false. *See Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 157-58 (2d Cir. 2007)("[o]nly an unambiguous message can be literally false").  Therefore, if language is susceptible to more than one reasonable interpretation, it cannot be literally false.  *See id.* at 158 (citations omitted).  Even the "literally true but likely to deceive" test requires the plaintiff to "demonstrate that the . . . representation involved an inherent or material quality of the product."  *Id. at* 153 n.3 (2d Cir. 2007).  In weighing whether a claim is misleading, courts must analyze the words or images considered in context.  *See id.* at 158 (2d Cir. 2007).  Then, under either test, courts may use "common sense and logic" in interpreting the message conveyed by a challenged statement.  *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).

Section 43(a) cases are proper only with respect to allegedly false statements of fact about a product, not statements of opinion.  "The Lanham Act's antideception provision . . . would be trivialized if it were applied to statements . . . concerning matters which an ordinary listener would recognize as personal opinion as opposed to representations of hard definable facts, such as product descriptions."  *Licata & Co., Inc. v. Goldberg*, 812 F. Supp. 403, 408 (S.D.N.Y 1993).  The Lanham Act is not meant to chill "[r]obust debate between competitors on matters of opinion," including "claims that one product . . . is far superior to that of rivals," all of which is "encouraged as part of the hurly-burly inherent in a free-market system, and indeed an open society."  *Id.*

Against this rich backdrop of precedent, Casper's claims clearly fail.  Casper asserts no misstatement of fact about any mattress product.  It alleges only that Hales "misleadingly implies that his statements are completely independent," and should have disclosed more prominently facts

about his referral relationships with Casper's competitors. Compl. ¶ 32. Thus, while tacitly acknowledging that Hales made only truthful statements about Casper's own and competitive products, and that Hales then rendered bottom-line opinions based on those true facts, Casper alleges that Hales misled his readers by failing to show them that they might have reason to view his opinions more skeptically. This does not suffice.

It is well established that a statement of opinion which cannot reasonably be seen as stating or implying provable facts about a product cannot form the basis of a Lanham Act claim. *See, e.g., Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) ("statements of opinion are generally not the basis of Lanham Act liability"); *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act."). Moreover, even if *some* opinion statements theoretically could be actionable, Hales' opinion statements as challenged in the complaint are not. Casper notes, for example, Hales statements that "[t]he Leesa mattress just feels incredible," "[t]he Purple mattress is one of the most interesting mattresses I have tested to date," "[t]he Alexander hybrid provides a delightful feel," "I'm a big fan of the feel of the Novosbed," and "[p]ersonally, I really enjoyed [the GhostBed's] feel," Compl. ¶ 32, and that the other mattresses he reviewed are "better" than Casper's. *Id.* ¶ 37. Had these statements been made by a competitor, the Lanham Act would treat them as inactionable "puffery." *E.g., Cablevision Sys. Corp. v. Verizon N.Y., Inc.*, 119 F. Supp. 3d 39, 53 (E.D.N.Y. 2015) ("[T]o say that one's product is 'better' than a competitive product, without more specificity, could well define the concept of puffery."). The statements are no more actionable when made by a reviewer like Hales.[4]

---

[4]     *See also, e.g., Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 288 (S.D.N.Y. 2007) (defendant's statements that it disagreed with plaintiff's

Unable to challenge directly either Hales' statements of fact or his statements of opinion, Casper alleges that "Hales fails to sufficiently disclose his material connections to these mattress retailers," and therefore "readers of Sleepopolis are unable to consider those connections in weighing the value of Hales's endorsements," or the "value of Hales's [allegedly] negative statements regarding Casper."  Compl. ¶¶ 33-34.  The key word in this allegation is "sufficiently."  On the Sleepopolis website, and in print below Hales' YouTube videos, Hales includes the disclosure that "[i]f you use one of my links and purchase a mattress . . . you should know that the respective companies pay me a small referral fee."  Compl. ¶ 48.  In recent months, Hales has "added [these] disclosures to the top of his individual and comparison reviews and modified [his] Disclosures Page, now titled 'How Sleepopolis Works.'"  *Id.* ¶ 58.  Hales further makes clear that "no company receives preferential treatment because of these referrals."  *Id.* ¶ 51.

Casper's challenges to the text of Hales' disclosures do not state a claim under the Lanham Act.  For example, Casper argues that "Sleepopolis is not supported by readers," as Hales' disclosure states, because he is paid "by affiliates . . . when [Hales] convinces a reader to buy one of their products."  Compl. ¶ 59.  But because there is no "donate" button on Hales' website, and because the disclosure states expressly that Hales receives payments as a result of product purchases made using his codes and links, Casper cannot plausibly contend that readers are being misled into thinking that readers are "supporting" Hales' website in some other way.  In the same paragraph of the Complaint, Casper contends that Hales' comparative reviews of Casper products

---

marketing practices and would withdraw business from third parties if they dealt with plaintiff were non-actionable statements of opinion); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08cv0442 (DLC), 2016 WL 815205 at * 8 (S.D.N.Y. Feb. 29, 2016) (postings made by defendant that the service at plaintiff's business was slow and that plaintiff's employees were rude were not actionable since they were "largely matters of opinion"); *Time Warner Cable, Inc. v. DIRECTV*, Inc., No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1138879 at *4 (S.D.N.Y. Apr. 16, 2007) (statement that defendant had "all the best channels" was subjective opinion).

are misleading because he "fail[s] to specify that [he] has a material connection with Leesa, but not Casper." *Id.* But Hales' website links allowing readers to purchase Casper's mattress are to Amazon.com, not Casper's website, and Casper cannot avoid the judicial admission it made in another of its lawsuits that Amazon pays referral fees. *See supra* page 6.

### C. The Federal Trade Commission's Guidance for Disclosure of Affiliate Relationships Gives Rise to No Private Right of Action and Cannot Form the Basis of a Section 43(a) Claim.

Casper's claim that Hales did not disclose his receipt of referral fees "sufficiently," Compl. ¶¶ 33-34, also fails for the separate reason that it rests solely on regulatory agency guidance that confers no private right of action. Casper relies upon Federal Trade Commission ("FTC") Guides Concerning the Use of Endorsements and Testimonials in Advertising (the "Endorsement Guides"), promulgated under Section 5 of the FTC Act. *See* 16 C.F.R. § 255. Even had Hales violated these Guides, which he did not, there is no private right of action to enforce regulations promulgated under the FTC Act. *See Alfred Dunhill Ltd v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974) ("Nowhere does the [FTC Act] bestow upon either competitors or consumers standing to enforce its provisions."); *Cheng Kai Yu v. Klapper*, No. CV 88-3683, 1989 WL 47702 at *3 (E.D.N.Y. Apr. 28, 1989) ("The [FTC] Act, which prohibits unfair commercial practices, does not grant either competitors or consumers standing to enforce its provisions.").

Casper cannot, therefore, give itself standing to enforce an alleged FTC requirement by repackaging its claim as one under the Lanham Act. Courts have regularly rejected similar attempts to use the Lanham Act as a way to enforce government regulations. In *IQ Prods Co. v. Pennzoil Prods. Co.*, 305 F.3d 368 (5th Cir. 2002), for example, a plaintiff tried to allege a Lanham Act §43(a) claim by asserting that that the defendant failed to label its product as "non-flammable" in violation of the Federal Hazardous Substances Act ("FHSA"). On appeal, the Fifth Circuit affirmed the grant of summary judgment to the defendants. "[B]y bringing a Lanham Act claim

14

against defendants for failing to properly label [its product], IQ is impermissibly attempting to circumvent the FHSA by converting the Lanham Act into a vehicle to enforce the FHSA, which bars private actions, and to usurp the regulatory function of the Consumer Product Safety Commission." *Id*. at 373-74.

But for the Endorsement Guides, which have no weight in a Lanham Act case, Casper could not even have attempted to state a claim based solely on how often on his website he repeated his disclosures.  In *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1138879 (S.D.N.Y. Apr. 16, 2007), for example, the plaintiff alleged that defendant DIRECTV misled consumers into believing that its high definition (HD) television services were available starting at $29.99 per month.  A television advertisement stated that DirecTV's services were available "Starting at $29.99/mo. Everyday price," but that $29.99 per month price was for basic services, and HD services involved higher costs.   Judge Swain denied a motion for a preliminary injunction because the commercial included a disclaimer at the bottom of the screen explaining that a consumer would have to spend more beyond the basic $29.99 per month to receive HD services.  *See id.* at *4.  Viewing the commercial as a whole, the presence of the disclaimer eliminated any potential falsity as to DirecTV's pricing claim.  Similarly here, the numerous disclosures through Sleepopolis of Hales' receipt of referral fees sufficed to eliminate any potential consumer deception.

Indeed, at least one court in this District — *Wellnx Life Sciences, Inc. v. Iovate Health Sciences Research, Inc.*, 516 F. Supp. 2d 270 (S.D.N.Y. 2007) — has held that even where a publisher failed to disclose *at all* an affiliate arrangement with the plaintiff's competitor when selling advertising space, when such space would not be sold "on a fair and equal basis" because of the affiliate arrangement, *id.* at 281, this did not violate the Lanham Act.  The Lanham Act

polices only misrepresentations about "an inherent quality or characteristic of the goods, services, or commercial activities at issue." *Id.* at 284.  Neither a "false designation of authorship," nor a failure to disclose an affiliate arrangement, suffices to state a Section 43(a) claim.  *Id.* at 286.  If total concealment of an affiliate relationship does not suffice to violate Section 43(a), it follows that *disclosure* of that relationship does not, either, even if the FTC itself can use its regulatory authority to require more fulsome disclosure.

> **D.**   ***Casper's complaint does not and cannot sufficiently allege the materiality of Hales' alleged omissions to consumers' purchasing decisions.***

Even had Casper been able to demonstrate that the text or alleged non-prominence of Hales' disclosures rendered his bottom-line opinions misleading, which it has not, Casper's complaint does not even attempt to allege that the presence or absence of these disclosures misled consumers *materially*.  His website reviews and YouTube videos all were filled with *facts* about the mattresses he discussed, none of which Casper challenges.  These facts alone provided consumers sufficient reason to choose mattresses which were less expensive than or objectively superior to Casper's, and Casper alleges nothing to suggest that Hales having placed his disclosures more prominently on his website would have changed consumers' weighing of those facts.

Section 43(a)'s materiality requirement "is based on the premise that not all deceptions affect consumer decisions."  *See Eprova v. BrookStone Pharms.*, 920 F.Supp. 2d 404, 423 (S.D.N.Y. 2013), *citing Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002).  A plaintiff must demonstrate that the false or misleading statement is material to or affects the consumer's decision to purchase the product.  *See Mylan Pharm., Inc. v. Proctor & Gamble Co.*, 443 F.Supp.2d 453, 462 (S.D.N.Y. 2006); *see also Merck & Co. v. Mediplan Health Consulting*, 425 F.Supp.2d 402, 417 (S.D.N.Y. 2006); *Nat'l Basketball Ass'n v.*

*Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (finding Motorola's allegedly false statement to be immaterial because "the inaccuracy . . . would not influence customers at the present time").

A Sleepopolis visitor who looked only at the facts asserted in Hales' reviews would have seen that the Leesa, Brooklyn Bedding, and GhostBed mattresses Hales compared were all less expensive than Casper's, and at least as fully-featured as Casper's. *See supra* pages 3-4, 5-6. Visitors would have seen that the Helix and Casper mattresses had almost identical pricing, but that the Helix mattress was fully customizable, while the Casper mattress is one-size-sleeps-all. *See* supra pages 4-5. Visitors also would have had the opportunity to watch videos that Hales recorded and posted showing intricate details about the mattresses he reviewed, how they are set up, and how they perform. Compl. Ex. B. at 6 (video for Leesa mattress review); 12 (video for Purple mattress review); 18 (video for Nest Bedding Alexander Hybrid mattress review); 24 (video for Novosbed mattress review); 30 (video for GhostBed review); 36 (video for Purple v. Casper mattress review); 64 (video for Casper v. Leesa mattress review); 70 (video for Casper mattress review). Casper does not challenge the truth of any of these statements, and Casper does not wrestle with the implications of all this truthful factual information. Casper also admits having gone at least two years without improving its product, despite dozens of competitive products launching in the meantime. *See* Compl. ¶ 40. If Casper lost sales to these competitors, it should place the blame for this where it belongs, on Casper's own failure to adapt to the more competitive marketplace, rather than blaming Hales for telling consumers truthfully that they have better and less expensive mattress options.

Further, even to the extent a visitor to Sleepopolis would want to know that Hales receives referral fees for purchases made through links or codes on his website, and that visitor for some reason missed Hales' explicit disclosure of this fact, the coupon codes themselves suggest the

connection.  All of Hales' coupon codes referenced in the Complaint have "Sleepopolis" in the code name — a clear indication that the seller is tracing the purchase to Sleepopolis.  Against the more plausible inference that consumers are choosing competitors' products over Casper's for other reasons, and either know or do not care that Hales may receive referral fees, Casper's Complaint contains only a wafer-thin and insufficient assertion that "upon information and belief, [Hales] statements [in his disclosures] have actually deceived potential mattress purchasers." Compl. ¶ 69.  Such "bald contentions, unsupported characterizations and legal conclusions are not well-pleaded allegations."  *Gottlieb Dev., LLC v. Paramount Pictures Corp.*, 590 F.Supp.2d 625, 631 (S.D.N.Y. 2008).  Casper's Complaint acknowledges that Hales has placed his disclosure in many more places on his website subsequent to the filing of this complaint, *see* Compl. ¶ 58, and yet Casper apparently cannot allege that this additional disclosure has had any impact on a more recent website visitor's likelihood to choose Casper's mattress over a competitor's.

Also fatal to Casper's ability to plead materiality is its Complaint's silence about what Casper thinks consumers would have done differently had Hales disclosed his receipt of referral fees more prominently.  Would consumers have bought Casper mattresses, even though Casper does not dispute that its product is more expensive and/or less fully featured?  Would they have sought out other reviews, and would that have made a difference, where Casper does not allege that other comparisons of its mattress to competitive products are any more favorable?  This inability to plead a tie between Hales' alleged lack of disclosure about his referral relationships and consumers' ultimate purchasing decisions is a separate reason why the Court should dismiss Casper's Lanham Act claim.  *See, e.g., Nationwide CATV Auditing Serv., Inc. v. Cablevision Sys. Corp.*, No. 12-CV-3648 (SJF) (ETB), 2013 WL 1911434, at *13 (E.D.N.Y. May 7, 2013) (mere

"speculation as to consumers' possible interpretation" of a statement "fails to adequately allege that [it] was likely to affect consumers' purchasing decisions or to cause actual consumer harm").

### E.   Casper Lacks Standing To Assert Its Lanham Act Claim Because It Cannot Tie Its Alleged Injury To Hales' Purportedly Inadequate Disclosures.

As shown above, Casper has failed adequately to plead multiple elements of a Section 43(a) violation.  Even if the Court is unconvinced by these arguments individually, however, the Supreme Court has commanded a separate *holistic* look at Lanham Act claims, and Casper's complaint cannot survive that scrutiny.  In the Supreme Court's most recent decision regarding a plaintiff's ability to sue under Section 43(a), *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) the Court made it clear that a Lanham Act cause of action only extends to plaintiffs who fall within the zone of interests protected by the Act and whose injury was proximately caused by a violation of that statute.  Pursuant to that requirement, a Section 43(a) plaintiff "must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 1391.  Casper has not satisfied and cannot satisfy the proximate causation requirement.

The facts of *Lexmark* are instructive.  Lexmark sold both laser printers and the toner cartridges for its printers.  *See* 134 S. Ct. at 1383.  Lexmark preferred to keep to itself the ability to replenish and resell depleted cartridges, and so, among other things, it "included a microchip in each [Lexmark] cartridge that would disable the cartridge after it ran out of toner; for the cartridge to be used again, the microchip would have to be replaced by Lexmark."  *Id.*  Static Control sold parts allowing companies other than Lexmark to replenish and resell Lexmark cartridges, including "a microchip that could mimic [Lexmark's]," and therefore defeat Lexmark's attempt to preclude these other companies' attempt to compete in the refurbishment market.  *Id.* at 1384.  Lexmark

wrote to Static Control's corporate customers — Lexmark's competitors — "falsely advising those companies that it was illegal to sell refurbished [Lexmark] cartridges and, in particular, that it was illegal to use Static Control's products" to do so. *Id.*

Although Static Control and Lexmark were not competitors, "Static Control alleged that Lexmark disparaged its business and products by asserting [in letters to Static Control's customers] that Static Control's business was illegal." 134 S. Ct. at 1393.  On these unique facts, the Supreme Court held that Static Control satisfied the proximate cause test because "a defendant who seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product may be said to have proximately caused the plaintiff's harm." *Id.* at 1393-94 (emphasis in original, citation omitted).  Another example the Supreme Court gave of when a non-competitor could satisfy the test would be false assertions that a product is defective. *See id.* at 1394.

This case differs markedly from *Lexmark* in at least three important respects.  First, Hales did not contend that Casper mattresses are illegal or defective.  To the contrary, he repeatedly called Casper's mattress a quality product, and included links allowing his readers to buy it. Compl. Ex. B at 42, 49, 55, 63.  He merely opined that other mattresses are better.  Second, whereas Lexmark's and Static Control's microchips performed the identical function interchangeably, Casper's mattress was both differently featured and more expensive than the products Hales opined that he preferred.  Casper, therefore, is likely to have lost sales because its product was *actually less desirable*, not just because Hales said so in an allegedly biased manner.  Third, whereas every microchip that Lexmark inserted into a used toner cartridge was a sale lost to Static Control, *see* 134 S. Ct. at 1394, the same is not true here.  Both Casper and its competitors offer "a risk free in-home trial" period.  Compl. ¶ 2.  Accordingly, if a consumer bought a mattress that Hales said he preferred, but that mattress was not to the consumer's liking, that consumer would have been right

20

back in the market for a mattress, and less likely to be swayed by Hales' opinions after having followed Hales' recommendation and being disappointed by it.  *See, e.g., Muhler Co. v. Ply Gem Holdings, Inc.*, 637 Fed. Appx. 746 (4ᵗʰ Cir. 2016) (no proximate cause where plaintiff "did not establish that [it] would have obtained the sale had the contractor not selected [the defendant's] product").

In a recent case building on *Lexmark* — *Wall & Assocs., Inc. v. Better Bus. Bureau of Central Virginia, Inc.*, Civ. No. 1:16-cv-119, 2016 WL 3087055 (E.D. Va. May 31, 2016) — the court dismissed a false advertising claim that rested on a faulty proximate cause theory similar to Casper's.  The plaintiff in *Wall*, a tax settlement business, alleged that negative statements about its business appeared on the Better Business Bureau website, and that this caused the plaintiff to lose potential customers.  Like Casper, that plaintiff could not dispute the truth of any of the statements on the BBB's website.  Instead, again like Casper, all the plaintiff alleged was that the BBB made false statements about its rating system.  The BBB promoted its rating system "as a national, uniform, and unbiased standard," when instead, allegedly, "it is implemented by regional, independent licensees applying their own subjective, biased, and personal criteria."  *Id.* at *2.  The court held that plaintiff's claim to be too attenuated to find standing:

> To get from Point A to Point B requires the following causal chain: Defendants' statements about its own product are false and misleading —→ Those statements generate consumer reliance and trust in BBB reviews and accreditations —→ Defendants utilize that trust in selling accreditation (the commercial link) —→ Consumers rely on Defendants' reviews of, and statements about, Wall's business —→ Consumers withhold or withdraw business from Wall. This is [] far removed from the "classic Lanham Act false-advertising claim in which one competitor directly injuries another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch."
>
> [*Id*. at *2, quoting Lexmark*, 134 S. Ct. at 1391.]

Wall's only direct injury in the case, the court held, was "from the BBB's poor grades of its service." *Id.* at *3. And just as Casper cannot sue over true statements of fact and non-actionable statements of opinion on Hales' site, Wall could not sue over the "non-actionable statements of opinion" on the BBB's website. *Id.* "It appear[ed] that Wall, aware of that fact, has attempted to identify other statements a few steps removed in the causal chain to try to make its claim," but *Lexmark*'s proximate cause test precluded Wall from succeeding in that attempt. *Id.* This Court should reach the same result when considering Casper's equivalent attempt to "identify other statements a few steps removed in the causal chain."[5]

The Court should dismiss Casper's Lanham Act claim, with prejudice.

## II.   CASPER'S NEW YORK GEN. BUS. LAW § 349 CLAIM FAILS BECAUSE CASPER HAS NOT PLEADED AN INJURY TO THE PUBLIC.

Casper's claim under New York's consumer fraud statute, Gen. Bus. Law § 349, also fails. Section 349 is, at its core, a consumer protection law. A plaintiff must show "(1) that the

---

[5]   *See also VRM Products, LLC v. V2H ApS*, No. 2:13-cv-7719-CBM-JEMx, 2016 WL 1177834 at *9 (C.D. Cal. Mar. 18, 2016) (plaintiff lacked standing to pursue damages under the Lanham Act because it could not show proximate cause between alleged statements that defendants' powder tobacco product was selected on the basis of a lower level of nitrosamines and lost sales; plaintiff only offered evidence that it would be harmed if an adult smoker, who wanted to purchase a smokeless nicotine product, relied on defendants' alleged false advertising to purchase defendants' powder tobacco product instead of plaintiff's electronic cigarettes.)

Although the Second Circuit has not yet had occasion to opine on the Lexmark proximate causation test, numerous cases decided under the Second Circuit's pre-Lexmark "strong categorical" or "reasonable commercial interest" tests addressed proximate cause in a similar manner and demonstrate that Casper's allegations of harm present only a too-speculative causal nexus to its alleged loss of sales. *See, e.g., Gifford v. U.S. Green Bldg. Council*, No. 10 Civ. 7747 (LBS), 2011 WL 4343815 at *2-4 (S.D.N.Y. Aug. 16, 2011) (no Lanham Act standing where defendant's product/services did not relate to the same fields in which plaintiffs specialized and allegations of harm were too speculative, as it was "not plausible that each customer who opt[ed] for LEED Certification [was] a customer lost to Plaintiffs"); *Conte v. Newsday, Inc.*, No. 06-CV-4859 (JFB) (ETB), 2013 WL 978711 at * 13 (E.D.N.Y. Mar. 13, 2013) (no Lanham Act standing where plaintiff "failed to establish a reasonable basis for causation, as his reasoning, 'depends on multiple levels of speculation'").

challenged act or practice was consumer oriented; (2) that it was misleading in a material way; and (3) that plaintiff suffered injury as a result of the deceptive act." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442 (TPG) (FM), 2014 WL 4723299 at *4 (S.D.N.Y. Sept. 23, 2014) (internal citations omitted). "As such, where a corporation," as opposed to a consumer, "brings a Section 349 claim, the gravamen of the complaint must be consumer injury or harm to the public interest," and it must include "some potential danger to the public health and safety." *Id.* Casper's complaint against Hales and his mattress blog does not satisfy this standard.

The only alleged harm identified in Casper's complaint is that "consumers have purchased mattresses from Casper's competitors rather than Casper." Compl. ¶ 64. The only alleged harm suffered specifically by New York consumers, according to Casper's complaint, is that "consumers located in New York have purchased mattresses from Casper's competitors." *Id.* ¶ 80. But because none of the mattresses recommended by Hales over Casper's mattress is alleged to be harmful to the public, New York consumers have not been placed at any risk by Hales' unchallenged statements of fact about the mattresses he reviewed or by his ultimate recommendations.

Casper is not the first company to try conjuring a § 349 claim out of an inter-company advertising dispute, and all prior attempts have rightfully failed. "[C]ourts addressing the question of harm under [§ 349] have drawn a distinction between false advertising claims that pose a danger to the consumer and those that merely encourage consumers to buy an inferior product or buy a product from one company where they may have preferred to buy it from another." *Conopco Inc. v. Wells Enterprise, Inc.*, No. 14 Civ. 2223 (NRB), 2015 WL 2330115 at *6-7 (S.D.N.Y. May 14, 2015) (dismissing § 349 claim where the "injury" was "lessened enjoyment" when consumers mistook defendant's product for plaintiff's). As another example, in *Romeo & Juliette*, "[i]f plaintiff had alleged that defendants' rival laser hair removal services were unsafe or caused

injuries," it might have had a § 349 claim, but, like Casper, it made no such allegations.  2014 WL 4723299, at *5.  *See also LBF Travel, Inc. Fareportal, Inc.*, No. 13 Civ. 9143 (LAK) (GWG), 2014 WL 5671853 at *11 (S.D.N.Y. Nov. 5, 2014) (allegations of "general consumer confusion" do not establish "direct harm to consumers"); *Kforce, Inc. v. Aiden Personnel, Inc.*, 288 F. Supp. 2d 513, 518-19 (S.D.N.Y. 2003) (even a "deliberate effort by one competitor to destroy the other's business is not considered a harm to the public interest," because "[e]ven if plaintiffs lost sales to the defendant, the public still received its product").

Because Casper has not alleged and cannot allege a threat to public safety from the statements on Hales' website, the Court should dismiss Casper's Section 349 claim.   Any amendment to this claim would be futile, and so this dismissal, too, should be with prejudice.

## <u>CONCLUSION</u>

Derek Hales and Halesopolis LLC have done nothing wrong.  To allow this case to go forward is to send the message to all opinion writers that if they write *truthful* statements critical of a company's product, they do so at their peril, and may be forced to defend themselves in the most expensive legal market in the country.  Casper's Complaint does not adequately plead the elements of a claim under Section 43(a) of the Lanham Act or New York Gen. Bus. Law § 349, and it cannot cure these fatal flaws in its Complaint by amendment.  The Court, therefore, should dismiss Casper's Complaint, in full, and with prejudice.

Respectfully submitted,

Dated: July 7, 2016
        New York, New York

By:    /s/ Jeffrey S. Jacobson
       **KELLY DRYE & WARREN LLP**
       Jeffrey S. Jacobson
       101 Park Avenue
       New York, NY  10178
       (212) 808-7800 phone
       (212) 808-7987 fax

       *Counsel for Derek Hales and*
       *Halesopolis LLP*

25