CASPER SLEEP, INC.

                Plaintiff,

v.

DEREK HALES and
HALESOPOLIS LLC,

            Defendants.

Case No. 16-cv-03223-CM

DEREK HALES and HALESOPOLIS, LLC,

        Counterclaim Plaintiffs,

v.

CASPER SLEEP, INC.,

        Counterclaim Defendant.

## AMENDED ANSWER AND COUNTERCLAIMS

Defendants Derek Hales and Halesopolis LLC (collectively "Hales") answer Plaintiff Casper Sleep, Inc.'s ("Casper") Amended Complaint and assert their affirmative defenses and Counterclaims as follows:

## ANSWER

## NATURE OF THE ACTION

1.      This paragraph states legal conclusions to which no responsive pleading is required. To the extent a responsive pleading is required, deny.

2.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Casper sells mattresses directly to consumers via its website.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

4.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

5.      Deny, except admit that Halesopolis owns and operates the website Sleepopolis, located at www.sleepopolis.com, that Hales posts content on Sleepopolis and truthfully presents that content as the product of his independent opinion, and that Halesopolis receives compensation when consumers purchase mattresses, including Casper's mattress, through referral links posted on Sleepopolis.

6.      The first sentence of this paragraph contains a legal conclusion to which no response is required.  To the extent a response to this paragraph is required, Hales states that his disclosures regarding the compensation he receives when readers of Sleepopolis use referral links on Sleepopolis to purchase mattresses speak for themselves, and otherwise denies the allegations.

7.      Deny.

**JURISDICTION AND VENUE**

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations.  Plaintiff has not pleaded sufficient facts from which the Court may conclude that losses cognizable under New York Gen. Bus. Law § 349 exceed the relevant threshold for federal court supplemental jurisdiction.

9.      Admit that this Court has personal jurisdiction over Halesopolis and deny that the Court has personal jurisdiction over Hales and that Plaintiff has suffered any injury in New York.

10.     Admit that venue is proper in this Court under 28 U.S.C. § 1391.

2

## PARTIES

11.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

12.     Admit that Halesopolis operates the Sleepopolis website, and that Hales and Halesopolis are Arizona residents, and otherwise deny.

13.     Admit that Halesopolis operates the Sleepopolis website, and that Halesopolis's principal place of business is in Phoenix, Arizona, and otherwise deny.

## FACTUAL ALLEGATIONS

### *Casper's Early Success*

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Casper sells mattresses directly to consumers through its website located at www.casper.com and that Casper mattresses are shipped in a compressed form.

15.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Casper purports to sell mattresses with a 100-day trial period.

16.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

17.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that numerous other companies sell mattresses online, including through third party platforms such as Amazon.com.

NY01\StalE\4333842.5

*The Rise and Regulation of Affiliate Marketing*

18.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that consumers can purchase mattresses online and seek out reviews of those mattresses.

19.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except deny any implication that Hales "partnered" with any mattress company.

20.      Admit that the Sleepopolis website contains referral links that allow the website so linked to know that the website visitor navigated there from Sleepopolis, and that if the consumer purchases a mattress after clicking on a referral link, Halesopolis may receive compensation from the company that fulfilled the purchase, as Hales discloses.  Otherwise, deny.

21.      Admit that referral links are a form of affiliate marketing and admit in general terms that referral links operate as described in this paragraph.  Otherwise, deny.

22.      Admit that website-specific coupon codes are another form of affiliate marketing and admit in general terms that some coupon codes operate as described in this paragraph, although not all coupon codes necessarily result in a commission being paid to Halesopolis if a reader entered the code but did not use a referral link to access the website where the sale transaction occurs.  Otherwise, deny.

23.      The allegations in Paragraph 23 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except admit that the Federal Trade Commission's statements speak for themselves.

24.      The allegations in Paragraph 24 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except admit that the Federal Trade Commission's statements speak for themselves.

NY01\StalE\4333842.5

25.     The allegations in Paragraph 25 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except admit that the Federal Trade Commission's statements speak for themselves.

26.     The allegations in Paragraph 26 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except admit that the Federal Trade Commission's statements speak for themselves.

27.     The allegations in Paragraph 27 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except admit that the Federal Trade Commission's statements speak for themselves.

28.     Deny, except admit that the Federal Trade Commission's statements speak for themselves.

### *Hales's Reviews are False and Misleading*

29.     Admit that Hales, truthfully, has stated that his mattress reviews are informed, independent, and unbiased, and that the specific quotes recited in this paragraph have appeared on Sleepopolis and speak for themselves.  Otherwise, deny.

30.     Deny, except admit that Halesopolis currently has no affiliate relationship directly with Casper, and that Sleepopolis contains referral links and/or coupon codes for numerous mattresses, including for Casper mattresses sold through Amazon.com.

31.     Deny, except admit that some links on Sleepopolis are referral links that can lead to Halesopolis receiving a commission if a consumer clicks on one of those links and then purchases and keeps a mattress.

32.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a responsive pleading is required, deny, except admit that the statements

referenced in Paragraph 32 of the Complaint and identified in Exhibit B to the Complaint are accurate and appeared on www.sleepopolis.com as of April 29, 2016.

33.     Deny.

34.     Deny.

35.     Admit and state that the reviews on Sleepopolis speak for themselves.

36.     Admit that Halesopolis has agreements with the listed companies pursuant to which Halesopolis may receive a commission when consumers use referral links to purchase mattresses from those companies, and further state that Hales has substantially the same relationship with Amazon.com with respect to Casper mattresses.

37.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the statements referenced in Paragraph 37 of the Complaint and identified in Exhibit B to the Complaint are accurate, appeared on www.sleepopolis.com as of April 29, 2016, and speak for themselves.

38.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the statements referenced in Paragraph 38 of the Complaint and identified in Exhibit B to the Complaint are accurate, appeared on www.sleepopolis.com as of April 29, 2016, and speak for themselves.

39.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the statements referenced in Paragraph 39 of the Complaint and identified in Exhibit B to the Complaint are accurate and appeared on www.sleepopolis.com as of April 29, 2016.

40.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that Halesopolis and Plaintiff

6

previously had an affiliate relationship that ended in July 2015, and that Hales made the quoted statements identified in Paragraph 40 of the Complaint.

41.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the "Marketing Sherpa" link provided in the paragraph contains an article pertaining to mattress company Leesa and that the YouTube links the quoted statements appear in that article.

42.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the "Marketing Sherpa" article links to a YouTube video posted by Hales and admit that the other YouTube videos also referenced in the paragraph were posted by Hales.

43.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that Hales sent the "tweets" referenced in the paragraph and that the quoted statements are accurate.

44.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that Hales sent the "tweets" referenced in the paragraph and that the quoted statements are accurate.

45.     The Court dismissed all claims related to this paragraph, so no response to it is required.  To the extent a response is required, deny, except admit that the statements quoted in Paragraph 45 are accurate and appeared on www.twitter.com as of April 29, 2016.

46.     Deny.

***Hales's Disclosures are Inadequate***

47.     Deny.

NY01\StalE\4333842.5

48.     Deny, except admit that the quoted statement appeared on Sleepopolis as of April 29, 2016.

49.     Deny, except admit that the quoted statement appeared on Sleepopolis as of April 29, 2016.

50.     Deny, except admit that the quoted statement appeared on Sleepopolis as of April 29, 2016.

51.     Deny, except admit that the quoted statement appeared on Sleepopolis as of April 29, 2016, and aver that the referral fee that Halesopolis receives when a reader purchases a Casper mattress from Amazon.com is similar to, and in some cases higher than, the referral fee that Hales receives from referral link sales of other mattresses.

52.     Deny.

53.     The allegations in Paragraph 53 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny, except state that the Federal Trade Commission's statements speak for themselves.

54.     Deny, except admit that the statement quoted in Paragraph 54 of the Complaint is accurate and appeared on www.sleepopolis.com as of April 29, 2016.

55.     The allegations in Paragraph 55 of the Complaint contain statements and/or conclusions of law to which no response is required.  To the extent a response is required, deny.

56.     Deny, except deny knowledge or information sufficient to form a belief as to the results of any particular Google search or the accuracy of Exhibits J and K to the Complaint.

57.     Deny.

58.     Deny, except admit that the quoted content from www.sleepopolis.com/how-sleepopolis-works was accurate as of June 10, 2016.

8

59.     Deny, except admit that the quoted statement from Sleepopolis was accurate as of June 10, 2016 and that Halesopolis receives compensation from referral links that are posted on Sleepopolis.

60.     Deny.

### *Casper's Damages*

61.     Deny, except admit that Halesopolis recognizes revenue from referral links and that Derek Hales benefits from that revenue.

62.     Deny.

63.     Deny, except deny knowledge or information sufficient to form a belief as to the results of any particular Google search or the accuracy of Exhibit L to the Complaint.

64.     Deny.

65.     Deny.

66.     Deny.

### FIRST CAUSE OF ACTION
**(Violation of Section 43(a) of the Lanham Act-15 U.S.C. § 1125(a))**

67-74.  These paragraphs are relevant only to the dismissed Lanham Act claim, as to which no responsive pleading is required.  To the extent a response is required, deny.

### SECOND CAUSE OF ACTION
**(Violation of Section 349 of the New York General Business Law)**

75.     Hales incorporates its responses to Paragraphs 1-74 as if fully set forth herein.

76.     Deny.

77.     Deny.

78.     Deny.

79.     Deny.

NY01\StalE\4333842.5

80.     Deny, except deny knowledge or information sufficient to form a belief as to whether any consumers in New York have purchased mattresses using Sleepopolis referral links or after reading content on Sleepopolis.  New York Gen. Bus. Law § 349 does not permit Casper to seek damages related to purchases made by consumers located outside New York State.

81.     Deny.

82.     Deny, except admit that Halesopolis has received commissions as a result of Sleepopolis readers' use of referral links on the site.

83.     Deny.

## PRAYER FOR RELIEF

Deny that Plaintiff is entitled to the relief requested or to any other relief.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE
**(Materiality)**

The statements identified by Plaintiff as false and misleading are not material to the purchasing decisions of online mattress consumers.

### SECOND DEFENSE
**(Unclean Hands)**

The doctrine of unclean hands precludes Plaintiff from recovering in this action.

## DEFENDANTS' COUNTERCLAIMS

Defendants and Counterclaim-Plaintiffs Hales and Halesopolis, LLC ("Halesopolis"), as and for their Counterclaims against Plaintiff and Counterclaim-Defendant Casper Sleep, Inc. ("Casper"), allege as follows:

NY01\StalE\4333842.5

## NATURE OF THE CLAIMS

1.      Casper's lawsuit against Hales and Halesopolis is part of a broader strategy by Casper to silence its critics.  A second aspect of that strategy was to artificially engineer the results a potential buyer would see if that person queried Google (or other popular search engines) for "Casper mattress reviews" or similar phrases.  Search engine users are more likely to "click" on the first few websites displayed in a search result than on lower-down results.  Consequently, Casper wanted to cause Google and other search engines to place positive reviews of its mattresses at the top of its search results, and — equally importantly to Casper — it wanted to cause those search engines to *demote* where negative reviews appeared in search results.

2.      The process of attempting to influence search engine results is commonly referred to, and will be referred to herein, as "search engine optimization," or "SEO."  The process of trying affirmatively to *demote* a website in search engine results is commonly referred to, and will be referred to herein, as "negative SEO."

3.      The negative SEO tactics that Casper pursued against Hales' www.sleepopolis.com website ("Sleepopolis") were unlawful, constituted tortious interference with Hales and Halespolis' prospective economic advantage, and defrauded consumers in violation of New York General Business Law § 349.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000 and is between citizens of different states.  The Court has jurisdiction over Hales' Counterclaims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this Court 28 U.S.C. § 1391(b) and (c) because Casper conducts business in this District, Casper maintains a principal place of business and resides in this District, a substantial portion of the events giving rise to Hales' Counterclaims took place in this District, and Casper is subject to personal jurisdiction in this District.

## PARTIES

6.      Defendant-Counterclaim Plaintiff Derek Hales is the Founder and Editor-in-Chief of Sleepopolis, a website that features his reviews of mattresses, pillows, bedding, and other sleep products. Derek Hales in an individual who resides in Arizona.

7.      Defendant-Counterclaim Plaintiff Halesopolis LLC is an Arizona limited liability company that owns and operates Sleepopolis. Halesopolis has its principal place of business in Phoenix, Arizona.

8.      Upon information and belief, Plaintiff-Counterclaim Defendant Casper Sleep, Inc. is an e-commerce company that sells mattresses and other sleep products.  Casper is incorporated in Delaware, with its principal place of business at 45 Bond Street, New York, New York.

## FACTUAL BACKGROUND

9.      Casper is an e-commerce company, launched in 2014, that sells mattresses, sheets, pillows and other products online.  According to Casper, it provides a "state-of-the-art" foam mattress product, sold directly to consumers through a simple online interface on http://www.casper.com and shipped in a box, with a 100-day trial period.  In June 2015, Casper also launched Van Winkle's (www.vanwinkles.com), a website with editorial content about sleep that links back to www.casper.com.

10.      Casper prides itself on its technological savvy.  As Casper's chief technology officer recently told CNBC: "We've always considered ourselves a tech company … We saw an

opportunity to bring tech innovation to an industry that has seen little of it in decades." Similarly, Casper's chief operating officer told Inc.: "We consider ourselves a tech company first." Casper co-founder Constantin Eis told The Guardian that "Casper is indeed a technology company" with "an army of web developers…."

11.     Although some consumers navigate directly to Sleepopolis through word of mouth, most find the site through internet search engines, including Google's. If a consumer goes to the Google site and types in a phrase such as "Casper mattress reviews" or "compare Casper to Leesa," the Sleepopolis website will appear prominently. Indeed, Sleepopolis currently is the first non-advertising result that Google displays in a search for "Casper mattress reviews."

12.     Casper alleges that since Casper "pioneered the digital mattress marketplace, dozens of online mattress retail start-ups have followed suit, selling mattresses on their own websites and on third-party platforms such as Amazon." Accordingly, although Casper is an aggressive marketer of its mattresses and other products, neither its mattresses nor its delivery system is special or unique. Indeed, other companies quickly entered the same market with mattresses that were more fully featured, less expensive, or both.

13.     As consumers gained more choices in the marketplace, but lacked the ability to test the various products for themselves in stores before purchasing them, consumers increasingly sought out detailed reviews of Casper's and its competitors' mattresses.

14.     Hales started Sleepopolis in September 2014 with the goal of helping consumers discover, research, and select mattresses and other sleep products that meet their needs, desires, and budget. Hales writes reviews for products that he or his employees have personally analyzed, researched, and tested. By 2015, Sleepopolis quickly had become one of the most popular sites

where consumers could learn information about Casper's and its competitors' "bed-in-a-box" mattresses.

15.     As Casper itself alleged in its lawsuit against Hales and Halesopolis, when Casper first brought its mattress to market, Hales, on Sleepopolis, publicly stated a highly positive opinion about Casper's mattress, relative to traditional mattresses that could be purchased in stores. At that time, traditional mattresses — and not other "bed in a box" mattresses — were Casper's main competition, and many were more expensive than Casper's mattress. Hales' Casper review was one of Sleepopolis's most visited pages.

16.     As other "bed in a box" firms came to market, however, beginning especially in 2015, Hales began to opine that these newer market entrants offered products superior to Casper's. Some of these mattresses were less expensive than Casper's, and Hales opined that they were nevertheless equal or superior to Casper's in quality. Other mattresses were comparably priced to Casper's but, in Hales' opinion, were superior to Casper's for reasons that Hales explained in his reviews.

17.     Although Hales' reviews stated his opinions about the positive and negative aspects of various mattresses, and his bottom-line conclusions about which mattresses bested others in head-to-head comparisons, Hales also provided consumers with accurate facts about the various mattresses he reviewed. These facts included details about mattresses' construction, how firm each mattress is, the extent to which the edges of a mattress are supportive, and, of course, the mattresses' prices.

18.     Casper simply found itself outperformed, on price, features, or both. Hales said so, and Casper found it could not abide criticism in such a heavily-trafficked website as Hales'.

NY01\StalE\4333842.5

19.     In the first half of 2015, while Hales was expressing his opinions that other mattresses offered consumers better value than Casper's, Hales and Halesopolis still had a direct contractual relationship with Casper, pursuant to which Casper would pay Halesopolis a commission if a reader of Sleepopolis clicked on a Sleepopolis "referral link" to Casper.com and then made a purchase from Casper.

20.     By roughly mid-2015, however, Casper came to the conclusion that it did not want to have this kind of arrangement with unbiased reviewers who were providing readers with honest mattress comparisons. It only wanted to have a referral link/commission arrangement with people who agreed actively to promote Casper's products and who undertook never to recommend another product as superior to Casper's, regardless of their actual opinions.

21.     In July 2015, Casper advised Hales that it would be terminating its contractual relationship with him effective on August 7, 2015.

22.     Immediately after Casper announced this termination, Casper approached Hales and offered to resume the relationship, on terms considerably more favorable to Hales, if Hales would agree to state a more positive opinion of Casper's mattress on Sleepopolis. Hales refused, insisting that the content on his site always did contain, and always would contain, nothing but Hales' honest opinions.

23.     The "threat" posed by Casper's termination of its contract with Hales, moreover, was toothless. In addition to selling mattresses on its own website, Casper sells its mattresses on Amazon.com. Amazon.com has its own referral program in which Hales participates. Effective on the same day that Casper terminated its relationship with Hales, Hales was able to switch the links on his site from pointing to Casper's website to pointing to Amazon's. Amazon.com pays

Hales referral commissions substantially similar to what Casper had been paying, and substantially similar to what Mr. Hales receives in referral fees from Casper's primary competitors.

24.     Indeed, because — both before and after Casper terminated its referral fee program — Hales received substantially the same referral fee for all of the mattresses he discusses on his website, Hales never had a material financial incentive to recommend one mattress over another. His opinions on his website all were honestly formed and not motivated by any financial incentive.

25.     After making good its threat to terminate its affiliate program, Casper had nothing left with which to threaten Hales. Hales went on stating his honest opinions, and even more companies began competing with Casper, offering better products at lower cost.

26.     Hales' website continued to grow in popularity after Casper discontinued its referral program. More and more consumers were reading Hales' opinions that Casper's mattresses were not a superior value for the money.

27.     Beginning very shortly after Hales refused Casper's attempted bribe, Sleepopolis came under a massive negative SEO attack.

28.     Google determines which websites to display at the top of its rankings through a proprietary and highly confidential algorithm.

29.     Part of what causes Google and other search engines to determine that a website is "popular" — and, consequently, to move that website up in search results — is when other websites include "links" to the site in question. In other words, if a website includes mention of the Sleepopolis site and discusses Sleepopolis having useful content about Casper's and other mattresses, search engines may take that into account and be more likely to place Sleepopolis higher in search results than websites lacking these external mentions.

NY01\StalE\4333842.5

30.     Not all mentions on external websites are helpful, however.  Websites that are irrelevant, low quality, contain spam content or malicious code, or are otherwise untrusted by Google and other search engines, can be detrimental to the domains they link to, especially in cases where links from these websites are created rapidly and in large quantities.  If search engines did not differentiate among sites in this way, the owner of a website who wanted to "game" search engine rankings theoretically could invade these untrusted and often insecure sites and place links to his own site there, all in an attempt to cause his site to rise in the search engine's rankings.  But Google and other search engine operators caught on to this tactic and began considering links placed on these untrusted sites *negatively* when determining search rankings.

31.     Put another way, when it comes to Google's methodology, there is indeed such a thing as bad publicity.  If one's intent was to cause "Website X" to *drop* in Google's rankings, one could go about doing that by placing links to Website X on untrusted sites that the bad actor expected Google to consider negatively.

32.     Very shortly after Hales declined Casper's attempted bribe, this is exactly what happened to Sleepopolis.  Thousands of negative SEO links to Sleepopolis began to appear on untrusted sites around the internet that allow for user-generated content (*i.e.*, comments, guest books, forums, etc.) but do not properly screen or monitor that content.  More and more such links appeared, soon growing to tens of thousands.

33.     These links principally were to Sleepopolis's main page, to the sub-page on Sleepopolis containing links to all of Sleepopolis' mattress reviews, and — most tellingly, to Sleepopolis' category page pertaining to Casper's mattress.  Only a small percentage of these links were to pages on Sleepopolis that pertained specifically to mattresses other than Casper's.

NY01\StalE\4333842.5

34.     Because so many of these links were to Hales' Casper-specific content, the net result of all of the links being placed around the internet was to cause Google to demote Sleepopolis when displaying results of *searches about Casper's mattress* specifically. Accordingly, this negative SEO attack principally benefited Casper at Hales' expense.

35.     Sleepopolis was not the only target of this negative SEO attack. Similar links appeared at the same time to the Casper-specific content of two other websites that Casper sued on the same day it brought this lawsuit against Hales: www.mattressnerd.com ("Mattress Nerd") and www.sleepsherpa.com ("Sleep Sherpa").

36.     Prior to suing Sleepopolis, Mattress Nerd, and Sleep Sherpa, Casper engaged a "reputation management" firm with the express goal of causing Google and other search engines to demote those three sites in search results about Casper's mattress and to promote content that Casper considered more favorable.

37.     On information and belief, many of the positive opinions stated about Casper which Casper tried to promote with its SEO efforts, were stated by people whom Casper compensated to state such positive opinions.

38.     The engagement of the "reputation management" firm coincided in time with the negative SEO attack on Sleepopolis.

39.     By virtue of these facts, Hales and Halesopolis believe — and, on that basis, allege — that Casper perpetrated this negative SEO attack on Sleepopolis, either itself or at its direction.

40.     By means of this two-pronged effort — to attack Sleepopolis and to artificially prop up websites that Casper paid to speak favorably about Casper — Casper temporarily caused Sleepopolis to drop in Google's rankings. Hales had to spend considerable time and effort hunting down the "fake" links to his website that Casper placed all over the internet and creating a

"disavow" list for Google so that it did not take these improperly placed links into account in determining the popularity and usefulness of Sleepopolis.

41.     Hales cannot know the extent of Casper's attack through SEO and other tactics to divert consumers from Sleepopolis.   Hales estimates, however, that Casper's conduct has prevented tens of thousands of consumers, at least, from viewing his website.   Many of those consumers would have purchased mattresses after doing so, entitling Halesopolis to commissions to the extent that consumers purchased mattresses using referral links or Sleepopolis-specific coupon codes placed on the Sleepopolis site.   Casper's improper conduct also caused Mr. Hales and Halesopolis reputational harm.

## FIRST COUNTERCLAIM
### (Tortious Interference With Prospective Economic Advantage)

42.     Hales realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 30 of these Counterclaims.

43.     Hales had a prospective economic advantage with Google in relation to the placement of www.sleepopolis.com in search engine results for "Casper mattress reviews" and similar search terms, because a higher and more prominent listing in the search results for such terms would lead to increased consumer traffic to the Sleepopolis website and the possibility of greater affiliate revenues.

44.     Casper knew of Hales' prospective advantageous business relationship with Google.

45.     Casper intended, through the wrongful conduct as detailed herein, to have a direct and adverse effect on Hales' prospective business relationship with Google.

46.     Casper intentionally and wrongfully interfered with and disrupted Hales' prospective advantageous business relationship with Google.

19

47.     Hales suffered damages as a result of Casper's intentional and wrongful interference with Hales' prospective advantageous business relationship with Google.

**SECOND COUNTERCLAIM**
**(Violation of Section 349 of the New York General Business Law)**

48.     Hales realleges and incorporate by reference each of the allegations contained in Paragraphs 1 through 36 of these Counterclaims.

49.     New York General Business Law, Section 349 states, in relevant part, that: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby deemed unlawful."

50.     As set forth herein, Casper has engaged in deceptive acts or practices in the conduct of its business, including by engaging in negative search engine optimization techniques designed to divert consumers away from Sleepopolis and to mattress reviews directed and paid for by Casper.

51.     Casper's deceptive acts are directed at consumers because the acts were designed to divert consumers away from Sleepopolis' mattress reviews and increase the popularity and visibility of mattress reviews directed and paid for by Casper.

52.     Casper's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

53.     Casper's deceptive acts affect the public interest in New York because, upon information and belief, consumers located in New York have purchased mattresses from Hales' competitors on the basis of consumers being diverted away from Sleepopolis.

20

54. Hales has suffered injury as a result of Casper's deceptive acts, both by direct diversion of potential affiliate sales and a lessening of goodwill associated with Sleepopolis, in an amount to be determined at trial.

NY01\StalE\4333842.5

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that this Court enter a judgment:

    a.   Dismissing Plaintiff's claims in their entirety;

    b.   Finding Plaintiff tortuously interfered with Defendants' prospective economic advantage;

    c.   Finding Plaintiff has violated Section 349 of the New York General Business Law;

    d.   Awarding damages in an amount to be determined at trial;

    e.   Awarding pre-judgment and post-judgment interest, to the fullest extent allowable at law or in equity, on all damages;

    f.   Awarding costs and disbursements of this action, including attorneys' fees; and

    g.   Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Defendants hereby demand, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: April 28, 2017
      New York, New York

Respectfully submitted,

By:    /s/Jeffrey S. Jacobson
        KELLEY DRYE & WARREN LLP
        Jeffrey S. Jacobson
        Melissa E. Byroade
        101 Park Avenue
        New York, NY 10178
        (212) 808-7800 phone
        (212) 808-7987 fax

        *Counsel for Defendants-Counterclaim Plaintiffs Derek Hales and Halesopolis LLP*