H5BKCASC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CASPER SLEEP, INC.,

4              Plaintiff,

5         v.                            16 CV 3223 (AJP)

6   DEREK HALES, ET AL.,

7              Defendants.

8   ------------------------------x
                                       New York, N.Y.
9                                      May 11, 2017
                                       3:05 p.m.
10
    Before:
11
                    HON. ANDREW J. PECK,
12
                                       Magistrate Judge
13
                        APPEARANCES
14
    FRANKFURT KURNIT KLEIN & SELZ PC
15       Attorneys for Plaintiff
    BY:  CAREN DECTER
16       LILY LANDSMAN-ROOS

17  KELLEY DRYE & WARREN LLP
         Attorneys for Defendants
18  BY:  MELISSA ERRINE BYROADE

19  BAKER & HOSTETLER LLP
         Attorneys for Third-Party Leesa Sleep LLC
20  BY:  DENNIS COHEN
         LINDA GOLDSTEIN

21

22

23

24

25

H5BKCASC

1          (Case called)

2          THE COURT:  I've reviewed the joint letter you sent

3     in, which somehow you managed to send in twice -- once without

4     the second attachment, once with -- but other than confusing

5     the number of motions on the docket, I can live with it.

6          What I think I will do is, since your positions were

7     very well set out, give you my ruling or tentative ruling as to

8     each one, and then have whatever discussion there may need to

9     be with respect to it, to see if you can snatch defeat from the

10    jaws of victory, on the one hand, or, on the other, get me to

11    change my mind.

12         The overriding thing I will say, however, first, is,

13    because this is a Rule 45 subpoena, be careful what you wish

14    for, on the plaintiff's side, because I am going to direct that

15    all reasonable expenses incurred by Leesa will be paid for by

16    Casper.

17         Anyone want to have any discussion on that, a point

18    that nobody actually raised but has been my long-held view with

19    respect to Rule 45?

20         Okay, hearing nothing, we'll move on.

21         The first issue, the communications and agreements

22    with defendants:  There is a protective order here that's a

23    two-tiered protective order.  I don't see, with one exception,

24    why this can't be produced on an attorneys'-eyes-only basis.

25    The one exception is to the extent Leesa refers to certain

H5BKCASC

1    market plans that are highly sensitive, and enough to be

2    considered trade secrets, I would allow redaction with respect

3    to that so that the document would show who sent it to who and

4    anything about payment in connection with it, but not what

5    Leesa's marketing plan may be or have been.  So, that's my

6    tentative ruling on the first issue.

7                Anyone want to discuss further?

8                MS. DECTER:  Yes, your Honor.

9                THE COURT:  Go ahead.

10               MS. DECTER:  Caren --

11               THE COURT:  You might want to use the podium and that

12   microphone so that Ms. Goldstein can hear you.

13               And, Ms. Goldstein, if at any point -- technology

14   isn't great here -- you can't hear me or the lawyers, just say

15   the word.

16               MS. GOLDSTEIN:  Thank you, your Honor.

17               MS. DECTER:  Good afternoon, your Honor.  Caren

18   Decter, for plaintiff Casper.

19               The only thing I would say about what your Honor just

20   stated is that we're certainly fine with redactions; we're not

21   trying to uncover their trade secrets.  Essentially, the only

22   thing that we would want to see is whether this $2,000 monthly

23   retainer was actually for work being done or was just some sort

24   of gratuitous payment that was being made to curry favor with

25   defendants.  And to the extent that the redactions made

4

1    wouldn't allow us to make that determination, that's the

2    only --

3              THE COURT:  Presumably, the redaction would show that

4    they, whether doing it page by page, which is a waste, or by an

5    indication, you know, "Attached to this email was a 55-page

6    marketing document we're not producing," I think you all can

7    work out the way to do that to prove what you wanted to prove

8    without interfering with what they want to protect.

9              MS. DECTER:  Agreed, your Honor.

10             THE COURT:  All right.

11             MR. COHEN:  I would like to speak as well, your Honor,

12    if I may?

13             THE COURT:  Yes.

14             MR. COHEN:  Dennis Cohen, of Baker & Hostetler, for

15    third-party Leesa Sleep.  Thank you for hearing us today, and

16    thank you, your Honor, for permitting my partner,

17    Ms. Goldstein, to dial in.

18             Leesa and Casper are direct competitors.  They both

19    operate in the space of online mattress retailers.  They have

20    no retail shops.  This makes SEO, search engine optimization,

21    extremely, extremely important to both of their business

22    models.  This search engine optimization is how online

23    businesses, like the two direct competitors here, really tend

24    to get the bulk of their business -- somebody goes onto Google

25    or Bing, types in what they're looking for or thinking about.

H5BKCASC

 1   And if you run one of these online businesses, you need a

 2   consultant who is an expert in search engine optimization to

 3   explain to you what people type in or explain to you how to

 4   turn those terms into something that's actually useful to your

 5   company.  These are very, very important.  And, completely

 6   aside from what is at issue at this litigation, this is one of

 7   the things that Derek Hales and Sleepopolis did for Leesa.

 8          So to be clear, we've already agreed -- and have

 9   largely done -- to turn over communications relating to U.S.

10   reviews, which is one of the four delineated statements that's

11   actually still at issue in this case.  They're now asking for

12   everything, everything else, with no limitation.  It might not

13   be in an attachment, it might not be a formal marketing plan.

14   These communications, all of these communications, they're

15   outside the scope of this litigation.

16          THE COURT:  All right.  So, let me raise this,

17   although on this, I think, you will be paying for the redaction

18   costs:  For each document, if it has anything substantive about

19   search engine optimization, you can redact that portion of it

20   with a box, a line, whatever, that says, "Redacted, search

21   engine optimization," or SEO for short, and that way you won't

22   give up any of the proprietary relationship.

23          MR. COHEN:  At the risk of snatching more defeat, your

24   Honor, to be clear, what Casper is seeking here is not a

25   specific category of documents; they're seeking the remainder.

H5BKCASC

```
 1    And having already agreed to give them what --
 2              THE COURT:  But you have to understand that their
 3    argument, as you just heard Ms. Decter say, is that, undisputed
 4    that if Leesa was paying Mr. Hails directly, that would relate
 5    to one of the four claims still in issue.
 6              MR. COHEN:  Actually, your Honor, that is precisely
 7    what we dispute.  Of the four statements alleged to be on
 8    Sleepopolis' website that are at issue, really only one of them
 9    is at issue here.  And Ms. Decter can correct me if she feels
10    otherwise, but I believe we're in agreement that it's really
11    about the first statement, "No review or content is written,
12    directed or otherwise influenced by any manufacturer or sleep
13    company."
14    A.   Right.  Now, in a world where we have lie detectors that
15    were admissible, one could ask Leesa and ask Mr. Hales, "Were
16    you influenced by the fact that you were earning millions of
17    dollars" -- and I'm perhaps being hyperbolic; I have no idea
18    what you paid, Mr. Hales or his company -- "yes, it's a
19    quote-unquote unrelated but were you influenced by the fact
20    that you had a separate business arrangement with Leesa from
21    which you were getting gobs and gobs of money?"
22              Now, perhaps if there were some way to cut down on the
23    makework or paperwork by a stipulation --
24              MS. GOLDSTEIN:  Your Honor, may I speak a moment?
25              THE COURT:  Sure, why not.  You're cutting off your
```

7

H5BKCASC

1    colleague, but whatever.

2            MS. GOLDSTEIN:  I didn't realize that.

3            But you raised something that I was actually going to

4    suggest, which is if the issue -- and as I understand the

5    relevant issue is whether another relationship existed between

6    the defendants and Leesa that might have influenced their

7    opinion.  Leesa is prepared to stipulate regarding the nature

8    of the consulting relationship that existed and the financial

9    aspect of that relationship.  Beyond that, our concern is that

10   the content of the communications would invariably relate to

11   marketing plans or strategies in the digital marketing context.

12   So, it would seem to me that it would be less burdensome for

13   everyone if we could agree on some stipulation to that effect

14   and not have to go through the process of having reviewing and

15   then redacting the communications.

16           THE COURT:  Have you produced, at least on the

17   monetary side, whether through documents or perhaps, going

18   forward, an interrogatory answer, have you produced what Leesa

19   has paid to Mr. Hales or his companies, and exactly when, so,

20   not just "in 2015 we paid X dollars" but "we paid A on

21   January 3, 2015, B on February 6, 2015," et cetera, et cetera,

22   et cetera?

23           MR. COHEN:  Your Honor, that type of chart has been

24   produced with regard to the affiliate relationship, yes.

25           THE COURT:  Guys, if you keep dancing, the dance will

H5BKCASC

1   be over sooner and I will just rule.  You know that's not what

2   I'm talking about.  So, don't waste my time.

3         Ms. Byroade, you want to get a word in?  You are an

4   actual party or counsel for the party.  Proceed.

5         MS. BYROADE:  Just for the record, the total amount of

6   the payments has been made available to plaintiff as $39,500.

7   We had produced monthly invoices for $2,000 a month for the

8   time frame, which was April 2015 to September 2016.  So, that

9   is in the record, and those payments are not in dispute.

10        THE COURT:  That seems to be drawing looks from

11  Ms. Decter.

12        MS. DECTER:  I could be mistaken, but I don't remember

13  seeing these monthly invoices.  I know that your colleague,

14  Mr. Jacobson, made in his emails, said the numbers but --

15        MS. BYROADE:  That total number, he actually said when

16  we were in court before -- I think it was on the record -- but

17  we did produce invoices.  I saw them with my own eyes, so

18  they're in the production.

19        MS. DECTER:  You did?

20        THE COURT:  Well, you all can work that piece of it

21  out, either by giving the Bates numbers --

22        MS. BYROADE:  Sure, yes.

23        THE COURT:  -- to Ms. Decter or otherwise pointing it

24  out.

25        I think the question gets down to what can you show,

H5BKCASC

1   without revealing proprietary information, that would show

2   whether the thirty-nine five or any piece of it is earned or

3   not earned.  So, I'm open for suggestions, but I'm also going

4   to remind you that generally the way we handle confidential

5   information is a confidentiality order, so, unless you're going

6   to tell me that the litigators at Frankfurt Kurnit are so in

7   bed with Casper's marketing people that they can't be trusted

8   to see this information, we're going to have to move on.  We're

9   15 minutes in and we're still on the first of the six or seven

10  issues in dispute.

11          MR. COHEN:  I believe there were just three, your

12  Honor.

13          THE COURT:  Okay, we're 15 minutes and we're on one of

14  three.  That leads to 45 minutes, and I was not prepared to

15  give you 45 minutes.

16          MS. GOLDSTEIN:  Your Honor, if we haven't already

17  produced it, we're prepared to produce documentation that will

18  identify all of the payments made for either the affiliates'

19  relationships, the consulting or any other payment that was

20  made --

21          THE COURT:  That's half --

22          MS. GOLDSTEIN:  -- the dates and the purpose of the

23  payment.

24          THE COURT:  Well, the purpose of the payment is

25  obviously going to be for the separate contract.  That's not

H5BKCASC

1    enough.  So, you're risking my patience.  If you want to do it

2    as an interrogatory, where you all, on the Leesa side, review

3    all of the emails and other forms of ESI communications and,

4    sort of similar to a privilege log but with more information,

5    say, you know, "in the month of April 2015 there were six

6    emails back and forth about search engine optimization, in the

7    month of June 2015 there were no such communications,"

8    et cetera, if you want to try that approach, along with an

9    appropriate stipulation from Hales' counsel, because

10   interrogatory answers or privilege logs from a nonparty are not

11   admissible at trial so you're going to have to get Hales'

12   buy-in as well as plaintiff's counsel, and you can do it

13   quickly, I'll let you try it and see if that satisfies the

14   plaintiff.  But if it doesn't, and if it doesn't because you're

15   not being sufficiently candid or descriptive or you're saying

16   there were six emails but three of them were of the form of

17   "when am I going to get your next email" and there's really no

18   substance to it, et cetera -- do you all think that will work?

19        Ms. Decter, you're fidgeting?

20        MS. DECTER:  Yes.  Respectfully, your Honor, Leesa is

21   a direct competitor.  For all intents and purposes, they're an

22   adverse party.  Although they're not technically a party to

23   this litigation, they do have an interest in the outcome of the

24   litigation, arguably.  And we've been at this now since

25   December --

H5BKCASC

1          THE COURT:  Believe me, this is going to be on a very

2     short turnaround.

3          MS. DECTER:  Our concern is that Mr. Hales',

4     defendants' deposition is scheduled for June 1st and then we

5     have a settlement conference in this case for June 14th.  Back

6     in February, we were told documents would be produced, then

7     again in March, and then I understand Ms. Goldstein switched

8     law firms, and we've been incredibly patient.  It's not clear

9     to me why their review and creation of a privilege log would be

10    any less burdensome than just doing that same review that they

11    would have to do.  Otherwise, as your Honor noted, we have a

12    two-tiered protective order, we have the ability to produce --

13         THE COURT:  Let me turn to Mr. Cohen.  If I went the

14    affidavit/privilege log/stipulation route, is that something

15    you could do in a very short time period?

16         MR. COHEN:  Not hearing my colleague, Linda, weigh in

17    on this -- and as I said, she's closer to the company than I

18    am --

19         THE COURT:  Whenever I say something to you, that

20    really means you or Ms. Goldstein, whoever wants to answer.

21         Ms. Goldstein, I think you're getting the handoff.

22         MS. GOLDSTEIN:  That is acceptable to us.

23         THE COURT:  Okay.  That wasn't my question.  My

24    question was:  How soon?  And I'll tell you now that your

25    answer to that will have a very big influence on whether I go

H5BKCASC

```
 1   that route.  And, presumably, you or your colleague has read my

 2   chambers' procedures and you know I run a rocket docket.  With

 3   those Miranda warnings, how long will it take you to do the

 4   affidavit/privilege log/stipulation?

 5              MS. GOLDSTEIN:  I'm going to defer to my colleague to

 6   give the timetable because he is closer to the documents than I

 7   am, but --

 8              THE COURT:  Come on.  Mr. Cohen?

 9              MR. COHEN:  Yes, your Honor, we have associates, we

10   can work on this very quickly.  So, today is the 11th, I

11   believe.  Ms. Decter has indicated that the deposition is

12   June 4th --

13              MS. DECTER:  1st.

14              MR. COHEN:  Oh, pardon me, June 1st.

15              -- so why don't we produce it one week before the

16   deposition.

17              THE COURT:  No.  So your deadline is next Wednesday,

18   May 17th, and you can do the affidavit approach,

19   affidavit/stipulation.

20              Let me first ask Ms. Byroade:  Are you prepared to

21   stipulate to the admissibility of this information in this

22   form?

23              MS. BYROADE:  I think I would appreciate a little more

24   guidance on what this is going to look like.  We certainly --

25              THE COURT:  It's going to, in essence, be a chart that
```

H5BKCASC

1    says, you know -- and I think monthly -- "in the month of

2    April 2015 there were three emails with marketing plans or SEO

3    suggestions from Mr. Hales and three responses from" --

4              MS. BYROADE:  I think, in principle, that should be

5    fine, as long as we have enough time to sort of check our

6    own -- obviously, we have the emails as well and we've produced

7    them --

8              THE COURT:  If you were going to produce them, we

9    wouldn't be having these problems.

10             MS. BYROADE:  We actually have produced them.

11             THE COURT:  But according to the cover letter, there

12   is a disparity in the number of emails your client produced and

13   even on the side where Leesa was willing to produce, which is

14   on the payments for the business on the clickthroughs, they

15   produced stuff that Mr. Hales didn't.

16             MS. BYROADE:  That's something I wanted to talk to

17   counsel for plaintiff with offline because that surprised me.

18   As I understand, it's 10 percent of 77 emails, so we're talking

19   about seven emails.  So, if we can identify those, I can track

20   it down.

21             THE COURT:  But that's the point.

22             MS. BYROADE:  My point is I think, as I say in the

23   letter, we produced about 2,000 emails, so to the extent we're

24   just checking the math that they put together, we need to --

25             THE COURT:  Well, to the extent, on this subject I

H5BKCASC

1    don't remember what you did and this is different and I

2    guess -- never mind, you wouldn't have these, so this issue

3    doesn't matter.

4            You are all going to try to work out a stipulation

5    with respect to this, and get it all done by June 17th.  If I

6    get a letter --

7            MS. DECTER:  May 17th.

8            THE COURT:  May 17th, thank you.

9            If I get a letter on the 18th saying the parties

10   didn't stipulate or Leesa didn't finish or whatever, then I'm

11   going to revert to my original plan, which is, you're going to

12   produce it on the attorneys'-eyes-only basis.

13           MS. DECTER:  Your Honor, can I just add one thing:  My

14   one concern -- and I suppose we'll deal with this on May 17th,

15   after we receive the proposed response -- is that it's not

16   going to -- because the actual communications redacted of

17   course for sensitive information, the other communications that

18   would give color into the depth of the relationship, which is

19   really what we're trying to explore, we don't want their trade

20   secrets --

21           THE COURT:  I suspect you can get a stipulation that

22   there was a cozy relationship because of the side deal.  I mean

23   there's a limit to what you need documents to prove.  But I

24   think the best way to do this is, how about by 5:00 p.m.

25   tomorrow you produce one month's worth of what this would look

H5BKCASC

1    like and you show it both to Ms. Byroade and to Ms. Decter, and

2    you all can then, over the weekend, figure out if this is going

3    to work or not, and if I get a letter on my desk when I show up

4    Monday morning, through the ECF system, that says this isn't

5    working, then I'll ruling accordingly.

6              MS. DECTER:  Thank you, your Honor.

7              THE COURT:  Okay.

8              So, now we can move on to issue two.  And it seems to

9    me this is a no-brainer and I think has already now been

10   conceded, and that is, the payment information.  Any reason

11   that you're still objecting to this?  I thought I heard you say

12   that you would be able to do this on a daily basis.

13             MS. GOLDSTEIN:  That's correct, your Honor.  I think

14   the objection was only to the extent that there were

15   communications related to that payment information that might

16   have also contained marketing information, but I think we've

17   now addressed that.

18             THE COURT:  All right.  So, by May 17th you'll produce

19   that information.

20             MS. DECTER:  Your Honor, just to be clear, it is our

21   request that communications related to payments that don't

22   contain the sensitive marketing information are precisely the

23   type of communications we're seeking.

24             THE COURT:  That is correct.  So, any communication,

25   either way, as to the payment and the documents showing the

H5BKCASC

1   payment, assuming there are documents.  If you're using the

2   old-fashioned system of checks, if there's direct deposit or

3   some other stuff, if there are documents, fine; if not, figure

4   out what sort of ESI you need to produce.  If that same

5   document also contains so-called propriety information, you can

6   redact the rest of the document.

7           MS. DECTER:  Your Honor, just to be clear, if there's

8   email communications about payments, we --

9           THE COURT:  Any communications about payments.

10          MS. DECTER:  Correct, thank you.

11          MR. COHEN:  Your Honor, just to be clear --

12          THE COURT:  Just to be clear, I've ruled and I don't

13  think I don't want to hear anything more, but go ahead.

14          MR. COHEN:  I'm just trying to be practical, your

15  Honor.  "Emails about payments" now becomes a very broad and

16  complex search procedure.  It's --

17          THE COURT:  How many emails are there between Leesa

18  and Mr. Hales?  2,000 or something?

19          MR. COHEN:  I don't know the answer to that.  That's

20  what was estimated in the letter.

21          THE COURT:  Okay.  Well, 2,000 can be reviewed, even

22  manually, in less than a day.  So, I'm not overly sympathetic.

23          Next:  The deposition of Leesa's CEO.  I see no reason

24  why the transcript should not be produced.  Anyone want to take

25  time to argue that?  It will be under the attorneys'-eyes-only

H5BKCASC

1    protective order in this case, which, I guess, is a very

2    similar protective order in the Mitcham case.

3              MR. COHEN:  Yes, your Honor.  The protective order

4    that says something is confined to this litigation or after

5    this litigation, documents can and must be returned or

6    destroyed --

7              THE COURT:  That, however, is usually to protect the

8    person whose data it isn't.  In other words, in the typical

9    case -- in this case, for example, if Mr. Hales is giving

10   documents to Casper and doesn't want those documents given to

11   somebody else in another case, it may be relying on the

12   protective order.  If it's your own data -- and a deposition in

13   a sense is your own data -- what's the difference, particularly

14   where it was a deposition that Casper's counsel already was at,

15   saw, and merely because the case settled and it had to be

16   returned, they don't have it anymore?

17             MR. COHEN:  Well, at the time of the deposition, your

18   Honor, the deponent nor counsel could have known that this was

19   going to become a sort of ongoing crusade against all media

20   companies that Casper perceives to be stacked against it.

21   We're all imaginative to come up with a million ways,

22   completely legitimate ways, in which a deponent would answer a

23   question in a tighter way if it knew that this was going to be

24   used in another deposition.  However, when there's a protective

25   order in place -- a negotiated protective order, amongst

H5BKCASC

```
1   sophisticated parties, signed by sophisticated judge, Jed

2   Rakoff -- the deponent, one would expect, would expect to rely

3   on that protective order going in.

4              THE COURT:  The objection is overruled.  Produce it --

5              MR. COHEN:  Thank you, your Honor.

6              THE COURT:  -- and since that doesn't require anything

7   other than a photocopy machine, by Monday morning.

8              What else, if anything?

9              MS. DECTER:  Your Honor, I just wanted to clarify one

10  thing about the first topic, request number 1, about the

11  communications agreements.  I understand that we have reached

12  an agreement as to the documents and communications that

13  pertain to the market-sensitive information.  When your Honor

14  first addressed this topic, your Honor said that all

15  communications, with that one exception, should be produced.

16  I'm just making sure that I understood your Honor's ruling

17  correctly.

18             THE COURT:  But they seem to be saying that all of

19  this, other than the part that's on the affiliate program,

20  which they are to produce in full, has to do, one way or the

21  other -- it may not be a formal marketing plan but it's a

22  business information.

23             MS. DECTER:  That's actually where I'm a bit confused

24  because throughout the back-and-forth -- we've been having

25  back-and-forth for a while now, and at one point Leesa's
```

H5BKCASC

1    counsel said that they would produce all documents and

2    communications related to U.S. reviews, and then at another

3    point they said all documents or communications about the

4    affiliate relationship.  And I could be off base, but it seemed

5    to me that they were making some sort of distinction that they

6    weren't even -- that they haven't yet produced -- I mean

7    they've only produced 77 emails, whereas defendants produced

8    nearly 2,000, so they weren't yet even agreeing to produce the

9    entire world of communications about the affiliate

10   relationship, which --

11            THE COURT:  So, let's be clear:  All documents about

12   reviews, all documents about the affiliate relationship get

13   produced -- those two categories, full production -- and

14   anything about payments, for anything, gets produced.  So, the

15   third category or fourth category, emails about the search

16   engine optimization work that Mr. Hales did for Leesa, that's

17   the stuff that you will be logging, so to speak, in the way

18   I've described it subject to the stipulation, so, if there is

19   no stipulation, you're going to have to produce it.  If there

20   is a stipulation, and this gives the plaintiff sufficient

21   information and gives defendant sufficient information to rebut

22   whatever arguments plaintiff is going to make, we're all good;

23   otherwise, I suspect I'll be talking to all of you on Monday or

24   the day after May 17th about further production.

25            And any email that's "I'm waiting to hear from you,

H5BKCASC

1   when are we going to have lunch," anything that doesn't have

2   what could arguably be SEO or other sensitive marketing

3   information has to be produced.  So, if it's 2,000 emails,

4   4,000, whatever it is, the good thing is, it's a small number,

5   and I certainly know that you have a very good e-discovery

6   group of attorneys at Baker & Hostetler.  So, if you need their

7   help, although this does not seem to me like it's probably

8   going to need anything other than manual review, you know who

9   to go to at your firm.

10         MR. COHEN:  Indeed, your Honor.

11         THE COURT:  All right, usual drill:  I'll require the

12   parties, but not Leesa, to buy the transcript.  And plaintiff

13   can give a free copy of the transcript, when they get it, to

14   Leesa.

15         If there is going to be much more work by you,

16   Mr. Cohen, you should enter an appearance on the ECF system

17   because, as of today, I'm not issuing any faxes or emails to

18   you, as we did with respect to Ms. Goldstein's telephonic

19   appearance, everything will go through ECF; and it's your

20   responsibility, one way or the other, to make sure you're

21   getting what you need from the ECF system.

22         MR. COHEN:  Understood, your Honor.

23         THE COURT:  Okay.

24         I think that's it.  Am I doing the settlement

25   conference with you on June 4th?  I've forgotten by now.

H5BKCASC

```
1              MS. DECTER:  On June 14th, yes.

2              THE COURT:  June 14th, okay.  Very good.  Thank you,

3    all.  Make your arrangements with the reporter.

4              MS. DECTER:  Thank you, your Honor.

5              MR. COHEN:  Thank you.

6              MS. BYROADE:  Thank you.

7              MS. GOLDSTEIN:  Thank you, your Honor.

8              (Pause)

9              THE COURT:  We're back on the record.

10             MR. COHEN:  Ms. Decter and I, while off the record,

11   conferred, and we had one question that requires clarification,

12   please.

13             It sounded to me, as long as we're not redacting, that

14   reasonable costs are paid for by Casper.

15             THE COURT:  Correct.

16             MS. DECTER:  And I might have misunderstood.  I

17   thought that the creation of the chart and the log, those

18   costs, were to be borne by Leesa since it was Leesa --

19             THE COURT:  Also correct.  So, the production of the

20   nonconfidential documents, reasonable expenses -- and that

21   doesn't mean using a $750-an-hour associate to do doc review --

22   that gets borne by Casper, along with whatever e-discovery

23   technology was used, if any, to pull that information off of

24   Leesa's system.  The redaction or the affidavit chart, in lieu

25   of redaction, is to be borne by Leesa.
```

H5BKCASC

1              Does that clarify?

2              MS. DECTER:  It does, your Honor.  Thank you.

3              MR. COHEN:  Yes, your Honor.

4              THE COURT:  Okay.

5                              * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25